## Cooke v. Metlab Company; Knerr v. Cooke

*Louis C. Bechtle,* for plaintiffs.
*Victor J. Roberts,* for defendants.

DITTER, J., December 18, 1968.—These two suits in equity involve conflicting claims of ownership in stock of a closely held corporation.

In the first action, Talmadge M. Cooke and Nancy Lea Cooke, his wife, instituted suit against Metlab

Company with a four-count complaint, seeking to establish certain rights as shareholders in Metlab. Metlab filed preliminary objections as the result of which counts 2 and 3 of the Cookes' complaint were dismissed and the fourth count was certified to the law side of the court. Thereafter, Horace C. Knerr, a major stockholder in Metlab, brought suit against Mr. Cooke, contending that he and not Cooke owned some of the stock in question. In effect, the action set forth in the first count of the Cookes' complaint and Knerr's suit were tried together and based upon the testimony and documentary evidence, the chancellor makes the following:

## FINDINGS OF FACT

1. Talmadge M. Cooke and Nancy Lea Cooke, husband and wife, are individuals residing at 2109 Barren Hill Road, Conshohocken, Montgomery County, Pa.

2. Metlab Company is a Pennsylvania corporation engaged in the business of heat treating metals, having its principal place of business at 1000 East Mermaid Lane, Wyndmoor, Montgomery County, Pa.

3. Horace C. Knerr is an individual, who resides at 302 East Gowen Avenue, Philadelphia, Pa., and is a stockholder in Metlab. He is also the president of Metlab.

4. Between 1952 and 1961, Cooke was employed as a salesman for Metlab, and in 1961 was also a member of its board of directors.

5. Many differences arose between Cooke and Metlab prior to 1961 as a result of which Cooke and Knerr entered into a series of discussions which culminated in an agreement dated May 19, 1961. In this contract, Cooke agreed to sell to Knerr 360 1/2 shares of Metlab owned by Cooke. This writing contained the following pertinent language.

"WHEREAS, SELLER is the owner free and clear of all incumbrances of 104 shares of the A stock and 256 1/2 shares of B (voting) stock of Metlab Company, a Pennsylvania corporation, and

"WHEREAS, SELLER has agreed to sell and PURCHASER has agreed to purchase said shares of stock upon the terms and conditions hereinafter set forth.

"NOW, THEREFORE, in consideration of the mutual promises hereinafter made and other good and valuable consideration, it is agreed:

"1. SELLER hereby sells and PURCHASER hereby purchases all of the aforesaid shares of stock for a consideration of Twenty-five Thousand Dollars ($25,000.00) . . . .

"14. SELLER agrees that he will not purchase, either himself or through third parties, nor will he become the legal or beneficial owner of any shares of COMPANY stock *except inheritance in kind of any shares of COMPANY from C. L. Jones only* of any class or description for a period of twenty-five (25) years from the execution of this agreement, and that he will not conspire with third parties, whether or not they are shareholders of COMPANY, to initiate actions, lawsuits and/*or* other activities inimical to the COMPANY's interests." (Italics indicate interlineations.)

6. In addition to owning the 360 1/2 shares of Metlab referred to in the agreement of May 19, 1961, Cooke had an option, prior to May 10, 1961, to purchase 161 shares of Metlab owned by his father-in-law, Clifford L. Jones, and held the right to vote these shares.

7. Without notifying Cooke that he was doing so, on May 10, 1961, Clifford L. Jones assigned the following Metlab shares to Cooke:

Stock Certificate No. 157, 30 Class A shares

Stock Certificate No. 131, 10 Class B shares
Stock Certificate No. 159,   5 Class B shares

8. As a gift to Cooke, on July 12, 1965, Clifford L. Jones assigned to him the following shares of Metlab:

Stock Certificate No. 132, 20 Class A shares
Stock Certificate No. 158, 46 Class B shares

9. Nancy Lea Cooke, wife of Talmadge N. Cooke, acquired the following shares of Metlab by assignment from Clifford L. Jones dated June 27, 1962:

Stock Certificate No. 249, 100 Class B shares

10. Despite its being informed of these assignments, Metlab refused to record and issue share certificates to the plaintiffs or record transfers of their interests to other persons.

11. From on or about July 12, 1965, to the date hereof, Mr. and Mrs. Cooke have requested Metlab to give them access to its records. These requests have been refused and Metlab has prevented the Cookes from attending regular shareholders meetings of the corporation and has withheld its financial statements from them.

## DISCUSSION

In their complaint, the Cookes requested that three sets of stock certificates in Metlab be delivered to them. By agreement, the problems connected with two of the blocks of stock have now been settled.

First, Metlab has transferred to Mrs. Cooke the 100 shares that Clifford L. Jones, her father, assigned to her on June 27, 1962. In addition, Metlab has agreed to transfer to Mrs. Cooke the 66 shares that Jones assigned to Mr. Cooke on July 12, 1965, the acceptance of which violated the contract dated May 19, 1961. Since Mr. Cooke has received $25,000, as provided for by that agreement, a single problem remains for the chancellor to resolve: did Cooke agree to sell all the stock he owned as of May 19, 1961, i.e., 405 1/2 shares,

or did he agree merely to sell to Knerr 360 1/2 of the shares he owned? If Cooke agreed to sell all of his stock, the 45 shares in question should be transferred to Knerr. If he agreed to sell only 360 1/2 shares, stock certificates for 45 shares must be issued to Mrs. Cooke as Mr. Cooke requested at the hearing.

Metlab contended in its new matter, as did Knerr in his complaint in equity, that the intention of both parties to the May 19, 1961, agreement was to divest Cooke of all his ownership in Metlab. To substantiate this contention, the purchaser pointed to (1) an alleged lack of internal cohesion in the agreement of sale, and (2) a memorandum which was executed April 27, 1961, three weeks prior to the execution of the agreement.

The chancellor erred in admitting this memorandum into evidence. It plainly violated the parol evidence rule, which has been explained as follows:

"Walker v. Saricks, 360 Pa. 594, 598, 63 A. 2d 9, well states the Pennsylvania Parol Evidence Rule: 'This Court said in Gianni v. R. Russell & Co., Inc., 281 Pa. 320, 323, 126 A. 791: "Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement: Martin v. Berens, 67 Pa. 459, 463; Irvin v. Irvin, 142 Pa. 271, 287. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence . . ." ' ' . . . the test is "whether parties, situated as were the ones to the contract, would naturally and normally include the one in the other if it were made. If they relate to the same subject-matter and are so inter-related that

both would be executed at the same time, and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing. This question must be determined by the court " ' ": Keleher v. LaSalle College, 394 Pa. 545, at 550-51 (1959).

In other words, extrinsic evidence such as the April memorandum is inadmissible to modify or change a written instrument. Unless a contract is ambiguous, the intention of the parties must be divined from its four corners, not from evidence of prior negotiations or oral understandings. The April memorandum was not a preliminary form of the May 19, 1961, agreement of sale, but dealt with a number of items, including a promise concerning the subsequent sale of stock. This memorandum was prepared by Knerr at the conclusion of his meeting with Cooke and was signed by both men. It noted, in brief form, a number of agreements that the two men had reached, but had no reference to the price for which Cooke's stock is to be sold to Knerr. Such a summary statement is an example of the negotiations that are merged into a subsequent formal agreement.

There are exceptions to the parol evidence rule, of course. If the memorandum Knerr sought to introduce fell under one of the exceptions, or if it revealed fraud, accident or mistake, it would be admissible. Knerr pleaded fraud in his complaint in equity but did not offer any substantiating proof at the hearing. Since fraud must be shown by clear, precise and indubitable evidence, extrinsic evidence is not admissible simply because fraud has been alleged. Moreover, the remedy for fraud is rescission. Neither Cooke nor Knerr desire rescission, since neither wishes to be placed in the same position as he was prior to the agreement of sale.

The parol evidence rule can also be waived if there has been a mutual mistake of fact or law. Knerr, how-

ever, neither pleaded nor proved the facts necessary to sustain such a position. Moreover, Knerr's attorney specifically refused to seek relief on that basis, noting that the remedy for mutual mistake is rescission.

The only available justification for the admission of the memorandum is the contention that the agreement of May 19, 1961, is ambiguous because of certain collateral matters and extrinsic evidence is required to clear up the ambiguity. If there is a patent ambiguity in a written instrument, the general rule provides that extrinsic evidence can be introduced, not to change, modify, or alter the written agreement, but to resolve the ambiguity: Iacovino v. Caterino, 332 Pa. 556, 558 (1938); Leebov v. United States Fidelity and Guaranty Company, 401 Pa. 477, 485 (1960). The ambiguity, however, must exist prior to the introduction of the extrinsic evidence. The evidence cannot be used to create the ambiguity: Universal Film Exchanges, Inc. v. Viking Theatre Corporation, 400 Pa. 27, 42 (1960); Root Estate, 187 Pa. 118, 120 (1898).

Extrinsic evidence is also admissible to explain a "latent" ambiguity, one that arises when there is some collateral matter which makes the meaning of the instrument uncertain. For example, a single word might refer to two objects or persons: Koplin v. Franklin Fire Insurance Company, 158 Pa. Superior Ct. 301 (1945). Another example of a latent ambiguity is a phrase that is subject to two or more interpretations. Often the courts seize upon a single word or phrase in ruling an ambiguity exists: Berke v. Bregman, 406 Pa. 142 (1962).

In the present factual situation, there is no ambiguity. The language is clear, precise and free of doubt. In fact, Knerr does not argue that the general wording is uncertain, nor does he contend that the mean-

ing of a particular word or phrase is subject to different interpretations. He does say, however, that the agreement becomes ambiguous unless it is interpreted to require a sale of all Cooke's shares to Knerr. Knerr argues that paragraph 14 shows clearly that Cooke was not to own any Metlab stock unless he inherited it, and that, therefore, Cooke's declaration of ownership in the introductory clauses of the agreement should be read to mean: "I own 360 1/2 shares, that is all I own, and I am selling all I own for $25,000." From this springboard, Knerr then concludes that the obvious intention of the parties was to effectuate a sale of all that Cooke owned. Since Cooke owned an additional 45 shares, Knerr contends that these shares should be conveyed to him. In the alternative, he takes the position that if this intention is not obvious, it raises enough of a question about the agreement to require receipt of the April 27, 1961, memorandum to clear up the ambiguity.

Unfortunately for Knerr, however, the conclusion is not that easily reached. It cannot be said that paragraph 14 makes no sense and has no meaning beyond the concept of Cooke's divesting himself of all interest in Metlab. It could well be that paragraph 14 was intended to provide for Cooke's remaining as a minority shareholder and that its intention was to keep him from challenging Knerr for eventual control unless he came into ownership of stock as a result of an inheritance. Therefore, there is no reason why Cooke's declaration of ownership at the beginning of the agreement *must* be read to mean that he owned no shares other than those to which reference was made. Had this been the intention of the parties, it would have been a simple matter to word the agreement accordingly.

There is another difficulty with the position which Knerr asserts. He knew that Cooke might reasonably expect to inherit stock from Jones, as shown by the interlineations referring to Jones in paragraph 14 of the agreement. Knerr knew, or could have easily ascertained, the number of shares which were registered in the name of Jones on the books of the corporation. He is seeking to obtain 45 of those shares without paying for them. There is no reason why the agreement must be read in a way that would make Knerr the real beneficiary of a gift from Jones to Cooke. Stating the same thing slightly differently, Knerr agreed to pay $25,000 for 360 1/2 shares of stock. He alleges the agreement does not make sense unless he is awarded 12 percent more stock without being required to pay any more than he originally agreed to pay. It would take a much more obvious inconsistency than Knerr describes to convince us that logic was with him in this regard.

Even if we were to assume that the May 19, 1961, agreement is ambiguous and thus that extrinsic evidence should be received, that introduced by Knerr and Metlab would be insufficient to vary the instrument in question. Although it was Knerr's position in his pleadings that the intent of the parties was to divest Cooke of all of his stock, neither Knerr nor anyone else testified to that effect and Cooke testified to the contrary. Cooke said that he intended to sell 360 1/2 shares and nothing more. The only extrinsic evidence offered by Knerr was the April memorandum, but when it was executed, Cooke only owned 360 1/2 shares. The 45 shares that he acquired in the interim were not covered by either writing.

Cooke testified that he did not attempt to conceal his ownership of the additional 45 shares. He stated that he did not know of the assignment until 1962 or

1963. This testimony, although questioned, was not contradicted by Knerr, and Jones was not called to give his version of the transaction.

On the basis of the available testimony, the chancellor concludes that the 45 shares in dispute were assigned by Jones to Cooke on May 10, 1961. The chancellor also finds that Cooke did not agree to sell those shares to Metlab under the terms of the May 19, 1961, agreement of sale. Accordingly, the stock represented by certificates 131, 157 and 159 should be issued to Nancy Lea Cooke in accordance with her husband's request. Of course, if it has not already done so, Metlab should also issue certificates to Mrs. Cooke for the stock assigned by Jones to Mr. Cooke on July 12, 1965.

## CONCLUSIONS OF LAW

1. Equity has jurisdiction of the parties and the subject matter.

2. Talmadge M. Cooke and Nancy Lea Cooke are shareholders of Metlab Company and are entitled to all of the rights and privileges given to them by the corporate charter, bylaws and the laws of the Commonwealth of Pennsylvania.

3. The 45 shares of stock in Metlab represented by share certificates 131, 157 and 159 were assigned by Clifford L. Jones on May 10, 1961, to Talmadge M. Cooke and were not sold by Cooke to Horace C. Knerr by the agreement of May 19, 1961.

4. As the result of this action, the agreement of the parties with reference to certain shares of stock and the direction of Talmadge M. Cooke, the books of Metlab shall reflect that, in addition to any other shares registered in her name, Nancy Lea Cooke is the owner of 111 shares of stock, as follows:

| Class A Stock | Date of Transfer | Certificate No. |
|---|---|---|
| 30 shares | May 10, 1961 | 157 |
| 20 shares | July 12, 1965 | 132 |
| 50 shares | | |

| Class B Stock | Date of Transfer | Certificate No. |
|---|---|---|
| 10 shares | May 10, 1961 | 131 |
| 5 shares | May 10, 1961 | 159 |
| 46 shares | July 12, 1965 | 158 |
| 61 shares | | |

## DECREE NISI

And now, December 18, 1968, in the matter of Talmadge M. Cooke and Nancy Lea Cooke, his wife, v. Metlab Company, a Pennsylvania corporation, no. 65-12233, it is hereby ordered, adjudged and decreed that:

1. Metlab Company shall indicate on its corporate books and records and shall issue appropriate certificates to show that in addition to any other shares registered in her name, Nancy Lea Cooke is the owner of 50 shares of Metlab Co.'s Class A stock and 61 shares of its Class B stock.

2. It is further ordered, adjudged and decreed that Metlab Company shall afford to Talmadge M. Cooke and Nancy Lea Cooke, his wife, all the rights and privileges provided to a corporate shareholder by its corporate charter, its bylaws and the laws of the Commonwealth of Pennsylvania.

And now, December 18, 1968, in the matter of Horace C. Knerr v. Talmadge M. Cooke, no. 66-3738, the complaint is hereby dismissed.

The prothonotary, in accordance with the rules of equity procedure, shall give notice to counsel of the

filing of these adjudications and that unless exceptions are filed within 20 days of such notice, the decree nisi will become the final decree upon praecipes being filed.